IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ADETUNJI AKANDE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | )   No.  05-cv-4212-JPG |
| | ) |
| RANDALL GROUNDS, TERRY GUY, | ) |
| JEANIE CAMPANELLA, and | ) |
| DEE DEE BROOKHART, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

THIS CAUSE comes before the Court on the defendants' motion for summary judgment (Doc. 32).  Plaintiff Adetunji Akande ("Akande") has responded to the motion (Doc. 41) and the defendants have replied to that response (Doc. 42).

**I.       Standard for Summary Judgment**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396.  Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

**II.     Facts**

Viewing all the relevant evidence and drawing all reasonable inferences in Akande's favor, the relevant evidence establishes the following facts for the purpose of this motion.

   A.     Akande's Employment

Akande began working for the Illinois Department of Corrections ("IDOC") in 1990. Over the years, he rose through the ranks until in January 2003 he was promoted to the position of clinical casework supervisor in the Clinical Services Department of Robinson Correctional Center ("Robinson"). The Clinical Services Department was responsible for the programs in which inmates participated. The clinical casework supervisor position was subject to the Illinois Personnel Code, 20 ILCS 415/1 *et seq.*, and Illinois' Central Management Services' ("CMS") Personnel Rules, both of which provided that employees could not be terminated or demoted without good cause.

At the time Akande became a clinical casework supervisor, one other person was also in that position, Richard Cervantes ("Cervantes"). The clinical casework supervisors ranked above correctional counselors, who were responsible for handling complaints of inmates in the housing units, but below the clinical services supervisor. There were eight to ten correctional counselors at Robinson. A correctional officer also assisted with some clerical work in the department, including entering pre-hearing data on inmate tickets into IDOC's computerized disciplinary tracking system ("DTS").

The written job description for the clinical casework supervisor position included the following:

> Under general direction of the Clinical Services Supv., Public Service Adm., directs the case management services program at Robinson Corr. Center; supervises delivery of counseling services as well as in-service training of counselors on the casework team; serves on various institutional committees; monitors in-patient substance abuse programs, orientation reviews and ensures compliance of policies and procedures.
>
> 1. Supervises staff; assigns work; approves time off; provides guidance and training; gives oral reprimands and effectively recommends grievance resolutions; completes and signs performance evaluations; establishes annual goals and objectives; counsels employees on problems with productivity and quality of work; determines staffing needs to achieve program objectives; reviews activity reports.
>
> * * *
>
> 6. Serves on special committees such as institutional assignments committee, grievance committee, adjustment committee, Pre-start committee; serves as Team Leader or Team Member of the Pre-start Program; explains and interprets committee goals and objectives to staff to incorporate findings into program objectives.
>
> 7. Performs other duties as required or assigned which are reasonably within the scope of those enumerated above.

The job description envisioned that approximately 5% of a clinical casework supervisor's

time would be spent serving on committees. In actuality, that estimate was usually inaccurate because the demands of individual institutions varied.

One of the duties expected of correctional casework supervisors under this job description was to serve on the adjustment committee, that is, to serve as a hearing officer for inmate disciplinary hearings for major infractions, or "major tickets." Hearings for major tickets required two hearing officers. Usually, when Cervantes was one of the hearing officers, he served as the chairman and entered data regarding those hearings into DTS. On some occasions, Akande, a correctional counselor or a correctional officer made the DTS entries for the major ticket hearings, even those Cervantes chaired. The warden would then retrieve the DTS data, review it and then decide whether to approve or modify the discipline recommended by the hearing officers. Each entry would take Cervantes approximately ten minutes, and there were approximately five to ten major ticket hearings per day. Correctional counselors typically heard tickets for minor offenses, or "minor tickets," and entered the relevant data into DTS themselves.

Another duty of a clinical casework supervisor was to serve as the team leader for the Pre-Start Program, a series of classes to prepare inmates for their release. Clinical casework supervisors also managed and reviewed the work of the correctional counselors working under them, made sure their duties were completed and had input into their performance evaluations. When a correctional counselor was absent, a clinical casework supervisor could reassign that counselor's work.

In the fall of 2003, Cervantes was promoted to the position of acting clinical services supervisor, leaving Akande as the only clinical casework supervisor. In Cervantes's absence, Akande usually conducted major ticket disciplinary hearings with a correctional counselor.

B.     Grounds's Supervision

Shortly after Cervantes' promotion, Akande became unhappy with his job duties when defendant Randall Grounds ("Grounds") entered the picture.  In November 2003, Grounds had become the assistant warden of programs and oversaw the Clinical Services Department.  After consulting with Cervantes in preparation for Akande's performance evaluation, Grounds came to believe Akande was having trouble interacting with the correctional counselors he supervised and that he was deficient in his work, his human relations skills, his leadership skills and his skills developing subordinates.  Akande disagreed with Grounds's assessment and believed he was performing his duties well.

In January 2004, Grounds appointed defendant Jeanie Campanella ("Campanella") to be the clinical services supervisor.  Grounds then gave Akande some directions he did not like.  For example, in early 2004, Grounds and Campanella directed Akande to personally enter data regarding major and minor ticket disciplinary hearings into DTS at the end of each day regardless of whether he was a hearing officer at that proceeding.  This task consumed most of Akande's workday, so he began delegating the work to correctional counselors.

As for the direction to enter minor ticket disciplinary hearing information, Akande entered data for at least 10 minor ticket disciplinary hearings, although there were more than a thousand hearings from December 2003 through February 2004, and delegated the rest to correctional counselors.  Despite his failure to enter data into DTS on all of these minor ticket disciplinary hearings, Akande was not referred for discipline himself.  Instead, the correctional counselors continued to enter data on the hearings over which they presided.

As for the direction to enter major ticket disciplinary hearing information himself instead

5

of delegating it to correctional counselors, Grounds ordered Akande to enter the data into DTS personally because Cervantes was no longer doing it in his new position and because it was not being timely entered since Cervantes's promotion.  In addition, correctional counselors had complained to Grounds that Akande had delegated this responsibility to them and that it was interfering with their other work.  Furthermore, Grounds wanted to have consistency in the way information was entered into DTS.  There were approximately 255 major ticket disciplinary hearings from November 2003 through February 2004.  Akande was referred for discipline numerous times because he continued to delegate this responsibility to correctional counselors.  As a result of those hearings, he received an oral reprimand, a written reprimand and a three-day suspension.

   Grounds also made Akande call inmates from the housing units to the hearing room, a task previously accomplished by correctional officers.

   Akande was also unhappy because he was not allowed to delegate his typing and supply ordering for the Pre-Start Program team to correctional counselors, although Grounds had told Akande he could use inmates to help him with the typing.  A secretary had typed the schedule for the prior Pre-Start Program leader.

   Akande was also bothered when Campanella ordered him to bring papers to or pick papers up from her office that he needed either to sign or to review.

   Another source of Akande's frustrations was Grounds's orders to him in November 2003 not to give any instructions to the correctional counselors.[1]  With the exception of prohibiting

---

[1] Akande's testimony that Grounds told the correctional counselors to ignore Akande's directions other than his attempts to delegate DTS data entry is inadmissible hearsay and will not be considered in ruling on the pending motion.

Akande from delegating his responsibilities for entering major ticket disciplinary hearing information into DTS and his Pre-Start Program responsibilities, the order was not enforced. In fact, Akande continued to give some orders to correctional counselors such as, for example, instructions to conduct escape risk reviews, to review the outside clearance status of certain inmates and to review their own caseloads, and Campanella consulted Akande about how to give instructions to correctional counselors.

In January 2004, Grounds informed Akande that Campanella would take over the responsibility of directly supervising counselors and assigned him only to serve as a hearing officer and enter information into DTS. Grounds further told correctional counselors to submit their recommendations on such things as good conduct credit requests directly to Campanella or Grounds. On at least one occasion, one of Akande's good time credit recommendations was changed before it was submitted to Grounds.

Akande continued to perform some of his regular duties, including but not limited to visiting the housing units when he had time to ensure the correctional counselors were doing their jobs, presiding over major ticket disciplinary hearings and making recommendations as to their dispositions, assessing inmate escape risks and drug program eligibility, making recommendations on inmate transfer requests, scheduling and lecturing in the Pre-Start Program, and assisting with the clinical services supervisor's responsibilities when that position was vacant. Nevertheless, beginning in January 2004, the vast majority of Akande's time was spent in major ticket disciplinary hearings and entering data into DTS.

Throughout the period Akande was unhappy with his job, his job title and pay were not affected. Akande challenged the assignment of his job duties six times through the grievance

procedure provided under the collective bargaining agreement governing his employment. All of the grievances were resolved or withdrawn before arbitration.

  C. <u>Akande's Departure</u>

On March 1, 2004, Akande was asked to sign a memorandum confirming, among other things, his duty to enter major but not minor ticket disciplinary hearing data into DTS, coordinate the Pre-Start Program and supervise correctional counselors. He refused to sign the memorandum and left work due to a headache.

On March 3, 2004, Akande went on extended disability leave on his doctor's recommendation following a diagnosis of depression, leaving no clinical casework supervisor at Robinson. On leave, Akande received disability payments considerably less than his normal salary.

As a consequence of Akande's departure, defendant Dee Dee Brookhart ("Brookhart"), the clinical services supervisor at that time, had to enter all of the major ticket disciplinary hearing data into DTS since Akande's departure. As with Cervantes, Brookhart spent about 10 minutes on each major ticket disciplinary hearing entry. Brookhart also had to serve as the Pre-Start Program team leader, do her own typing, and order her own supplies.

  D. <u>The Litigation</u>

In November 2005, Akande filed this lawsuit under 42 U.S.C. § 1983 alleging that the defendants violated his Fourteenth Amendment rights by depriving him without due process of law of a property interest in not being demoted or terminated without good cause. The defendants now ask the Court for summary judgment on the grounds that Akande was not deprived of a property interest because he was not demoted as that term is defined by Illinois law

and was not discharged under circumstances that amounted to constructive discharge. They also argue that he received due process of law and that defendants Terry Guy, Campanella and Brookhart are not personally involved in any decision regarding Akande's duties. The defendants further assert that they are entitled to qualified immunity.

Akande concedes that his claims against Guy and Brookhart have no merit because they were minimally involved in the conduct of which Akande complains. Therefore, the Court will grant summary judgment in favor of Guy and Brookhart.

**III.    Analysis**

   A.    Qualified Immunity

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *accord Saucier v. Katz*, 533 U.S. 194, 206 (2001).

A court required to rule upon the qualified immunity issue must first consider whether the facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201; *see Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). If it is clear that there has been no constitutional violation, there is no need for further inquiry; the official is entitled to qualified immunity. *Saucier*, 533 U.S. at 201.

If the evidence demonstrates that there may have been a constitutional violation, then the court should determine whether the right allegedly violated was clearly established at the relevant time. *Id*. at 202. "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. at 201; *see McNair v. Coffey*, 279 F.3d 463, 465 (7th Cir. 2002). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202. The plaintiff bears the burden of demonstrating that a constitutional right is clearly established. *Denius*, 209 F.3d at 950.

B.      Constitutional Violation

Akande has failed to present sufficient evidence to show that his constitutional rights have been violated. In order to prove a § 1983 claim against an individual, a plaintiff must show that the defendant deprived the plaintiff of rights secured by the Constitution or laws of the United States and that the defendant was acting under color of state law. *Ienco v. City of Chicago*, 286 F.3d 994, 997-98 (7th Cir. 2002); *see Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *McKinney v. Duplain*, 463 F.3d 679, 683 -84 (7th Cir. 2006); *Brokaw v. Mercer Co.*, 235 F.3d 1000, 1009 (7th Cir. 2000). To determine whether a plaintiff has stated a due process violation the Court asks two questions: (1) whether the plaintiff was deprived of a protected property or liberty interest, and (2) what process was due. *Sonnleitner v. York*, 304 F.3d 704, 711 (7th Cir. 2002); *see Parratt v. Taylor*, 451 U.S. 527, 536-37 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986). In this case, Akande has simply failed to present evidence from which a reasonable jury could conclude that he was deprived of a protected interest.

To establish a protected property right, a plaintiff must demonstrate a legitimate claim of entitlement, not just a hopeful expectation. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *Ulichny v. Merton Cmty. Sch. Dist.*, 249 F.3d 686, 702 (7th Cir. 2001); *Polenz v. Parrott*, 883 F.2d 551, 555 (7th Cir. 1989). Property interests are not created by the Constitution but instead "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577; *accord Ulichny*, 249 F.3d at 699-700; *Polenz*, 883 F.2d at 555. The claim of entitlement may be created, for example, by statute or by contract. *Bishop v. Wood*, 426 U.S. 341, 344 (1976).

In this case, several things are very clear. First, it is clear that Akande had a property right defined by state law which provided that he could not be demoted or terminated without cause. *See* 20 ILCS 415/11; 20 ILCS 415/8b.16; *Atterberry v. Sherman*, 453 F.3d 823, 826 (7th Cir. 2006). It is further clear that Akande was not formally demoted or terminated. Illinois law defines demotion as "assignment of an employee to a vacant position in a class having a lower maximum permissible salary or rate than the class from which the demotion was made for reasons of inability to perform the work of the class from which the demotion was made," 80 Ill. Admin. Code § 302.470(a), and Akande was not assigned to a vacant position in a class with a lower pay range. Neither was he given the proverbial "pink slip" to terminate his employment. Thus, the dimensions of his property right in his employment are defined as not being assigned to a vacant position in a class with a lower salary range. Akande had no legitimate expectation – or protected property right – created by state law that he would not be subject to the change in

11

job duties he experienced.

This case is similar in many relevant aspects to *Atterberry*, which came to the same conclusion.[2]  In *Atterberry*, a high-level employee of an Illinois agency with the same employment rights as Akande was reassigned to perform the duties of a lower level employee and was stripped of his supervisory responsibilities, his private office, his government car and his parking space.  *Atterberry*, 453 F.3d at 824-25.  However, he retained his job title and his pay.  *Id.* at 825.  The Court of Appeals held that Atterberry had a property interest in not being demoted without cause but that that interest was, in turn, limited by Illinois law to the right not to be assigned to a vacant position in a class with lower pay.  *Id*. at 826-27.  Thus, the Court of Appeals concluded, Atterberry had no legitimate expectation grounded in state law that his job duties within his position would remain the same.  *Id.* at 827.  His only legitimate expectation grounded in state law was that he would retain his position and pay absent cause to change them, and he was not deprived of that expectation.  *Id.*

The holding in *Atterberry* makes quick work of Akande's case, for Atterberry's job changes were clearly more egregious than Akande's and he did not suffer a property right deprivation.  While Atterberry was assigned job duties performed by lower level employees and was stripped entirely of his supervisory duties, Akande's assignments all fell within the job description of the clinical casework supervisor and included at least some supervisory tasks.  Even ministerial tasks such as data entry and supply ordering came within the catch-all duty of performing "other duties as required or assigned which are reasonably within the scope" of the

---

[2]*Atterberry* was decided the day after this Court entered the order denying the defendants' motion to dismiss.

other duties mentioned in the job description. For example, entering major ticket hearing information into DTS is "reasonably within" the task of serving on the adjustment committee. That the duties did not strictly follow the anticipated percentage of Akande's time to be allotted to them does not amount to a constitutional deprivation; such deviations are par for the course in a system where each institution has varying needs. The only protected property rights Akande had, like Atterberry, were the rights not to have less pay and not to have a lower position title, and neither of those rights was violated prior to Akande's leaving his employment with IDOC. For these reasons, the Court concludes that Akande was not deprived of the right not to be demoted without cause.

To the extent Akande attempts to rely on a sort of constructive demotion referred to in *Head v. Chicago Sch. Reform Bd. of Trustees,* 225 F.3d 794, 803 (7th Cir. 2000), and *Swick v. City of Chicago*, 11 F.3d 85, 86 (7th Cir. 1993), *Atterberry* makes clear that such references are dicta and that, in any case, those cases are distinguishable from Atterberry's, and even more so from Akande's, situation. *Atterberry*, 453 F.3d at 827-28; *see also Barrows v. Wiley*, 478 F.3d 776, 782 (7th Cir. 2007).

To the extent Akande attempts to rely on constructive discharge as a deprivation of his property right in his job, that theory will not save his case. It is true that deprivation of employment by constructive discharge can amount to the deprivation of a property right. *See, e.g., Levenstein v. Salafsky*, 164 F.3d 345, 351 (7th Cir. 1998); *Parrett v. City of Connersville*, 737 F.2d 690, 693-95 (7th Cir. 1984). If an employee's pay and benefits are not reduced but the employee is relegated to intolerable working conditions, his departure from the employment can amount to a deprivation of a protected property right. *See Wozniak v. Conry*, 236 F.3d 888 (7th

Cir. 2001); *Levenstein*, 164 F.3d at 351. In its order denying the defendants' motion to dismiss this case, the Court reviewed the facts of *Parrett*, *Levenstein* and *Wozniak*:

> In *Parrett*, a police captain who could only be discharged for cause was not assigned any duties and was given a windowless, telephoneless room that had once been a closet to sit idly in during his working hours. *Parrett*, 737 F.2d at 693. He became ill (mentally and physically) as a consequence and took medical retirement from the police force. *Id.* The Court of Appeals upheld a jury verdict based on a finding that the police captain was constructively discharged and thereby deprived of his property right not to be discharged without cause. *Id.* at 694-95.
> Similarly, in *Levenstein*, a tenured medical school professor and department head who could be terminated only if "necessary and justified" alleged that he was suspended, and therefore unable to see patients, and reassigned to demeaning "make-work" assignments clearly below his capabilities. *Levenstein*, 164 F.3d at 348, 350. The Court of Appeals held that such allegations pled a constructive discharge and thus a deprivation of a protectable property right. *Id.* at 351.
> . . . . In *Wozniak*, a tenured professor was foreclosed from teaching, barred from researching and assigned instead to manage his department's website. *Wozniak*, 236 F.3d at 889. The Court of Appeals found that the duty changes could be the type that would cause a reasonable, self-respecting person to resign (as in *Parrett*) and could also impact the professor's prospects for promotion and for obtaining private consultant work (the kinds of harm to future income discussed in *Swick*, *Head* and *Bordelon*). *Id.* at 889-90. The Court of Appeals concluded that there was a question of fact whether the professor had been deprived of a property right. *Id.*

In this case, there is no evidence that Akande's job duties assigned by Grounds and Campanella were so intolerable that they amounted to a constructive discharge. He was not relegated to a closet and given no work to do as in *Parrett*, and the duty changes he alleges pale in comparison to the changes imposed in *Levenstein*. They do not even amount to the types of changes imposed in *Wozniak*, where the employee was given tasks outside his area of professional training. On the contrary, as noted above, Akande was not ordered to do anything that was not within his job description. That he was required to spend more time doing ministerial tasks and less time doing supervisory tasks than his job description anticipated and

than he would have preferred, or that he was asked not to perform some of his favorite duties, did not render his working situation intolerable so as to amount to constructive discharge.

For the foregoing reasons, the Court finds that no reasonable jury could find that Akande was deprived of a constitutionally protected property right and that Grounds and Campanella are therefore entitled to qualified immunity. Having found insufficient evidence of the deprivation of a constitutional right, the Court need not consider whether the state of the law at the relevant time was clearly established and will grant summary judgment in favor of Grounds and Campanella.

### IV.     Conclusion

For these reasons, the Court **GRANTS** the defendants' motion for summary judgment (Doc. 32) and **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATE: October 24, 2007**

                                                          s/ J. Phil Gilbert
                                                          **J. PHIL GILBERT**
                                                          **DISTRICT JUDGE**